UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSE A. JUSINO,  :
    Plaintiff,  :
      :
v.  :    CASE NO. 3:16-cv-961 (MPS)
      :
MARK FRAYNE, et al.,  :
    Defendants.  :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Jose A. Jusino, commenced this civil rights action challenging his mental health treatment while incarcerated at Northern Correctional Institution in Somers, Connecticut. The plaintiff claims that the defendants, Mark Frayne, Gerard Gagne, Jr., Paul Chaplin, Craig Burns, and Scarlett Forbes, have been deliberately indifferent to his mental health needs in violation of the Eighth Amendment. The defendants move for summary judgment. For the reasons that follow, the defendants' motion is GRANTED in part and DENIED in part.

I.    <u>Facts</u>

On February 28, 2013, correctional staff at MacDougall-Walker Correctional Institution ("MacDougall") observed the plaintiff swallowing several pills. Dr. Naqvi saw the plaintiff, who refused to be evaluated. Dr. Naqvi sent the plaintiff to the emergency room. When he returned to the correctional facility, the plaintiff was placed on behavior observation status.

On March 7, 2013, the plaintiff was transferred from MacDougall to Northern Correctional Institution ("Northern"). The transfer was based on the February 28, 2013 overdose and the fact that the plaintiff had set his mattress on fire. The assessment upon admission showed the plaintiff to be at risk of harm to himself and others. Dr. Frayne ordered the plaintiff admitted to the infirmary. He was assessed

twice by mental health staff on March 7, 2013. Dr. Coleman recommended that mental health observation status be initiated.

On March 8, 2013, the plaintiff was again evaluated by Dr. Frayne. The plaintiff expressed an intent to commit suicide. Dr. Frayne placed the plaintiff on suicide watch and ordered bag meals for the plaintiff's safety.

On March 11, 2013, Dr. Frayne assessed the plaintiff and noted that he was exhibiting better control. Dr. Frayne reported that the plaintiff denied current thoughts of suicide. Dr. Frayne ordered that the plaintiff be closely monitored for two weeks. During March 2013, the plaintiff was on trial for murder and saw mental health staff consistently to deal with the stress of trial.

On April 10, 2013, the plaintiff met with Dr. Gagne about his sentencing. Dr. Gagne noted that the plaintiff was calm, showing no distress, anger or anxiety. He expressed no suicidal or homicidal ideations. The same day, the plaintiff also was assessed by Dr. Frayne. The plaintiff made no threats of self-harm.

On May 4, 2013, defendant Forbes met with the plaintiff. The plaintiff was stable, expressed no concerns for his safety, and displayed no signs of psychosis.

At some point, the plaintiff asked to enroll in the "Start Now" program. The parties dispute whether, at some unspecified date, defendant Forbes told the plaintiff she was too busy or her caseload too large to allow her to meet with him every week.

On June 18, 2013, the plaintiff was seen in the medical unit in response to reports that he was cutting himself. The plaintiff had superficial scratches on his left arm.

Defendant Forbes met with the plaintiff on June 19, 2013, to discuss his refusals of mental health treatment. She encouraged the plaintiff to meet with her. In a medical incident report dated June 20,

2013, defendant Forbes noted that the plaintiff denied any current thoughts to hurt himself or others. Dr. Frayne ordered the plaintiff discharged to behavior observation status. Medical records show that the plaintiff was seen on June 22, 2013, and not seen again until November 2013.

On November 8, 2013, a custody officer saw the plaintiff take a handful of green and yellow pills. The plaintiff was admitted to the hospital. Dr. Frayne completed a medical incident report on November 11, 2013. The plaintiff complained to Dr. Frayne that other inmates, assigned to the same clinician as he, were seen more frequently than he was. Dr. Frayne noted that the plaintiff presented no current risk of self-harm. Dr. Frayne ordered the plaintiff admitted to the medical unit on suicide observation and required follow-up daily tours by medical and mental health staff. The plaintiff was classified as a Special Needs Inmate at Northern.

On November 14, 2013, Dr. Frayne met with the plaintiff and noted that he appeared acutely irritated and at risk to injure himself or staff. The plaintiff used obscene and insulting language toward Dr. Frayne. The plaintiff was described as expressing poor insight, impulse control, and problem solving. Dr. Frayne ordered the plaintiff to remain on suicide watch. That same day, the plaintiff attempted to injure himself. Nurse Scruggs described the injury as a superficial abrasion on his left forearm. On November 15, 2013, Dr. Frayne ordered the plaintiff to remain on suicide watch in the infirmary.

On November 18, 2013, Dr. Frayne met with the plaintiff. The plaintiff denied suicidal ideation, plans, or intent. The plaintiff said that he felt much better and wanted to return to his regular cell. The plaintiff said that he would make a better effort to contact staff for help in the future. Dr. Frayne determined that the plaintiff's mental health status was baseline and ordered him discharged to population. Dr. Frayne saw the plaintiff the following day. The plaintiff denied any safety concerns.

3

On November 27, 2013, the plaintiff met with defendant Forbes. At first, the plaintiff refused a one-on-one session. He was brought to the medical screening area where defendant Forbes was meeting with another inmate. The plaintiff waited for two minutes. He then became upset and asked the correctional officer to return him to his cell. The plaintiff told defendant Forbes that, if she was too busy to see him, she should not pull him from his cell. He did not think he should have to wait to see her. The plaintiff also stated that he had been seen enough for that month. He denied any safety concerns.

On December 4, 2013, Dr. Gagne saw the plaintiff and noted that he was noncompliant with Prozac. The plaintiff feared sexual side effects of the drug. Dr. Gagne ordered the plaintiff to be tapered off the drug and then reassessed.

On December 7, 2013, Dr. Burns ordered that the plaintiff be admitted to the infirmary and placed on behavior observation status. This action was based on a letter the plaintiff wrote to the forensic psychiatrist who had examined the plaintiff after he killed his cell mate. Specifically, the psychologist informed Dr. Burns that she had received a letter from the plaintiff that had "tones of desperation" and stated that "something may happen." (*See* Defs.' Ex. 9, ECF No. 69 at 64.) Dr. Frayne followed up with the plaintiff on December 9, 11, 12, 14, 18, 19, 20 and 23. These sessions were comprised of speaking to the plaintiff through the cell door. On December 12, 2013, in response to the plaintiff's attempt to hang himself, Dr. Frayne ordered the plaintiff to be returned to wearing a safety vest, and all items except a blanket were removed from the cell.[1] Dr. Gagne met with the plaintiff on December 10, 2013, and Dr. Burns evaluated him on December 23, 2013.

On September 29, 2014, Dr. Frayne placed the plaintiff on behavior observation status. Dr. Frayne referenced information that suggested the plaintiff would engage in self-destructive behavior.

---

[1] Although the plaintiff states that Dr. Frayne's December 12, 2013 Medical Incident Report shows that he was strapped down, the report, ECF No. 69 at 77, makes no mention of restraints.

The plaintiff was angry and defiant, and refused private therapy sessions. The plaintiff had filed a lawsuit against mental health staff. The plaintiff claims the placement was solely in retaliation for filing the lawsuit. On September 30, 2014, Dr. Gagne met with the plaintiff for assessment. The plaintiff stated that he was more likely to hurt someone else than himself and denied any recent suicidal or homicidal ideations.

On October 1, 2014, Drs. Frayne and Gagne met with the plaintiff together. Dr. Gagne discontinued the plaintiff's medication. The following day defendant Forbes saw the plaintiff at his cell door. She did not note any mental health concerns. On October 4, 2014, the plaintiff again saw defendant Forbes at his cell door. He initially declined services and told defendant Forbes to leave him alone.

On December 10, 2014, 2000 milligrams of Seroquel were found in the plaintiff's cell. Defendant Forbes met with the plaintiff to assess his safety.

On April 20, 2015, the plaintiff told custodial staff that he had swallowed batteries. The same day, defendant Forbes met with the plaintiff, who was covering his cell door window, preventing staff from verifying his safety. When the plaintiff finally uncovered his window, he was angry, agitated, and verbally aggressive. He told defendant Forbes that it was her fault. Over the preceding weekend, the plaintiff had written several provocative requests to the mental health staff. In the requests, the plaintiff threatened to do something to gain her attention if defendant Forbes did not meet with him first thing in the morning. The following day, Dr. Gagne saw the plaintiff.

On April 22, 2015, Dr. Frayne assigned himself to be the plaintiff's caseworker in place of defendant Forbes. Dr. Frayne attributes the change to the volatility the plaintiff was displaying toward defendant Forbes. The plaintiff claims that the change was retaliation for arguing with Dr. Frayne

shortly before the reassignment. Dr. Frayne noted concern for the plaintiff's ability to control his emotions and impulses.

On April 23, 2015, the plaintiff made multiple threats to harm, assault, or kill mental health staff and himself. He specifically threatened to kill Dr. Frayne on this date.

On May 1, 2015, Dr. Gagne met with the plaintiff. He did not threaten self-harm or make overt threats to harm staff. The plaintiff did, however, express anger against Drs. Gagne and Frayne.

On July 2, 2015, Dr. Gagne met with the plaintiff on an informal referral from Dr. Frayne. Dr. Gagne renewed his treatment recommendations and explored coping with the plaintiff. Dr. Gagne met with the plaintiff on July 28, 2015. The plaintiff questioned why he was there and told Dr. Gagne not to call him down again. Dr. Gagne assessed the plaintiff as not expressing any suicidal or homicidal ideations.

On October 6, 2015, the plaintiff met with Dr. Chaplin. The plaintiff did not appear psychotic or depressed. Dr. Chaplin assessed the plaintiff as stable and having a personality disorder with antisocial and borderline traits.

On February 28, 2016, the plaintiff was threatening to harm himself with a paper clip.

Additional facts taken from the record will be set forth below as necessary.

II.     Legal Standards

    A.     Motion for Summary Judgment

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). The moving party may satisfy his burden "by showing—that is pointing out to the district court—that there is an absence of evidence to support

the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He must present such evidence as would allow a jury to find in his favor to defeat the motion for summary judgment. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

On summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.,* 715 F.3d 417, 427 (2d Cir. 2013). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted).

B. Deliberate Indifference to Mental Health Needs

"The Eighth Amendment forbids deliberate indifference to serious medical [or mental health] needs of prisoners." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted). To establish a claim for deliberate indifference to a serious medical or mental health need, the plaintiff must allege facts demonstrating two elements. The first element is objective; "the alleged deprivation of adequate medical [or mental health] care must be sufficiently serious." *Id*. (internal quotation marks omitted). Under this objective element, a court must determine first, "whether the prisoner was actually deprived of adequate medical [or mental health] care," and second, "whether the inadequacy in medical [or mental health] care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162

7

(2d Cir. 2003). Nevertheless, the Second Circuit has presented "a non-exhaustive list" of factors to consider: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). The defendants do not argue that the plaintiff's mental health need is not serious.

The second element is subjective; the defendant "must be subjectively reckless in [his] denial of medical care." *Spavone*, 719 F.3d at 138. The inquiry is whether the defendant "has knowledge that an inmate faces a substantial risk of serious harm and . . . disregards that risk by failing to take reasonable measures to abate the harm." *Lewis v. Swicki*, 629 F. App'x 77, 79 (2d Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994)) (internal quotation marks omitted). The defendants must have acted or failed to act "while actually aware of a substantial risk that serious inmate harm will result." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks omitted). In contrast, "mere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., a conscious disregard of a substantial risk of serious harm." *Chance*, 143 F.3d at 703 (internal quotation marks and citation omitted). Further, "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id*.

III.    Discussion

The defendants move for summary judgment on the grounds that the plaintiff cannot demonstrate facts supporting the subjective prong of the deliberate indifference test with respect to any defendant and

that, in any event, all defendants are protected by qualified immunity. I first consider the evidence in the record relating to defendants Burns and Chaplin, and conclude that, even when construed in the light most favorable to the plaintiff, the record includes no evidence from which a reasonable juror could find that either failed to act knowing that the plaintiff faced a substantial risk of serious harm. I next consider the evidence with respect to defendants Frayne, Gagne, and Forbes, and conclude that there are genuine issues of material fact that preclude summary judgment as to the alleged constitutional violation or as to qualified immunity.

    1.  <u>Drs. Burns and Chaplin</u>

*Dr. Burns*

The plaintiff alleges that on December 7, 2013, Burns, who is described as the "Chief of Psychologist Services for the Department of Correction" (Pl.'s Mem., ECF No. 84 at 16), ordered him placed on behavior observation status because of a letter the plaintiff wrote to a forensic psychiatrist. The plaintiff also alleges that, on December 23, 2013, Burns evaluated him and he asked for mental health treatment, but Burns "did not return." (ECF No. 84-5 at 4.) Other than these two episodes, which occurred about two weeks apart, the plaintiff points to no facts in the record suggesting that Burns had any involvement with the plaintiff. There is no evidence in the record that Burns had a continuing role in the plaintiff's treatment. Further, there is evidence in the record that others – including Frayne, Gagne, and Forbes – did. For example, after Burns ordered the plaintiff placed on behavior observation status following his receipt of the communication from the forensic psychiatrist about the plaintiff's desperation, Frayne followed up with the plaintiff. In short, on the one occasion Burns was apprised that the plaintiff might face a risk of serious harm, he took prompt and reasonable action by ordering the plaintiff placed on behavior observation status and apparently followed up with the plaintiff two weeks

9

later.  The plaintiff has failed to point to any evidence suggesting that Burns became aware of any other risks of serious harm to the plaintiff or, for that matter, that he remained involved in, or responsible for, the plaintiff's treatment at all.  The defendants' motion for summary judgment is granted as to the claim against Dr. Burns.

*Dr. Chaplin*

The only mention of Chaplin in the plaintiff's affidavit is that Chaplin met with the plaintiff on October 6, 2015, that Chaplin told him he would return in two weeks to help the plaintiff get treatment, and that Chaplin did not return for eight months.  (ECF No. 84-5 at 4.)  Further, the plaintiff admits that when they met on October 6, 2015, Dr. Chaplin observed the plaintiff to be stable and not to be psychotic or depressed, and assessed the plaintiff as stable.  (ECF No. 67-2 at 10; 84-7 at 5).  In his note, Dr. Chaplin indicates that he met with the plaintiff at the warden's request, recommended reviewing mental health care options available to the plaintiff at Northern, and indicated his intention to meet with the plaintiff again in two weeks.  (Defs.' Ex. 14, ECF No. 69 at 124).

Again, the plaintiff points to no evidence in the record suggesting that Dr. Chaplin had continuing involvement in or responsibility for the plaintiff's treatment, and the medical note in the record (ECF No. 69 at 124) belies any suggestion that Dr. Chaplin consciously disregarded a serious risk of harm.  His failure to promptly schedule a follow-up meeting is, at most, negligence, which is not cognizable under section 1983.  The defendants' motion for summary judgment is granted as to the claim against Dr. Chaplin.

2. Dr. Frayne, Dr. Gagne and Social Worker Forbes

The lengthy medical chart in the summary judgment record suggests that these three defendants provided the plaintiff's treatment.  The plaintiff has submitted his own affidavit and affidavits by other

10

inmates that can be summarized as follows (*See* Pl.'s Mem. Ex. E, ECF Nos. 84-5, 84-6): Frayne and Gagne repeatedly told the plaintiff that he would not receive treatment until he stopped complaining and controlled his emotions. Frayne also threatened to place the plaintiff on behavior observation status in retaliation for disrespectful behavior and for oral complaints about treatment, grievances, and lawsuits. Gagne discontinued medication prescribed at the University of Connecticut Health Center without explanation and told the plaintiff that he would get nothing with his attitude. When the plaintiff told Gagne that he was going to hurt himself, Gagne told the plaintiff that it was his choice. Forbes at times refused treatment until the plaintiff stopped acting "childish[ly]" and at times told the plaintiff she was too busy to see him. Forbes once walked away from the plaintiff's cell door during a "crisis intervention" even though the plaintiff was banging his head. (ECF No. 84-6 at 3.) In addition, all three defendants often saw the plaintiff at his cell door and discussed his issues within the hearing of other inmates and staff, leading other inmates to taunt him about his mental health issues.

The defendants have provided affidavits of Drs. Frayne and Gagne. Frayne states that the plaintiff suffers from antisocial personality disorder and borderline personality disorder. Frayne further states as follows: One characteristic of antisocial personality disorder is disregard for and violation of the rights of others. Features of the disorder include deceit and manipulation. Persons suffering from antisocial personality disorder often experience difficulty with authority figures. Recurrent suicidal and self-mutilating behavior is a characteristic of borderline personality disorder. (Frayne Aff., ECF No. 73 ¶¶ 11-12.) Frayne states that these disorders are treated by "highly structured cognitive-behavior interventions that rely on labeling and recognizing emotions and learning how to better handle interpersonal challenges, while conforming to societal norms." (*Id.* ¶ 13.) Frayne suggests that the

11

Court would be rewarding manipulative behavior if it acceded to plaintiff's wish to remove him from the plaintiff's treatment team.

Gagne concurs with Frayne's diagnosis. He notes that, although medication is not the usual treatment for the plaintiff's disorders, he prescribed several different medications over the years, most of which were discontinued for noncompliance. (Gagne Aff., ECF No. 72 ¶¶ 10-12.) Although both doctors opine that the plaintiff is receiving appropriate mental health care, neither has defined what the cognitive-behavioral intervention comprises or how it has been utilized with the plaintiff. Frayne states that the plaintiff must take responsibility for his behavior and practice dealing with people without manipulation and impulse-driven aggression. (ECF No. 73 ¶ 14.) He does not explain, however, how he is treating the plaintiff to accomplish this objective, and the treatment plan in the record – which the plaintiff alleges was not even created until after this lawsuit was filed – is brief and does not provide clear support for the notion that the treatment Frayne describes is actually being provided to the plaintiff. The undisputed facts show responses to multiple attempts at suicide or self-mutilation, but are vague regarding treatment of the plaintiff's personality disorder(s). Thus, the Court cannot determine whether the treatment Frayne references has been provided to the plaintiff. Further, even if it were clear that Frayne and Gagne were offering a medical opinion that the actual conduct of which the plaintiff complains – for example, threatening to place the plaintiff on behavior observation status if he continued complaining or being disrespectful, and walking away from his cell while he was banging his head – was in furtherance of his treatment for personality disorders, there would still be an issue of fact about the defendants' state of mind that would preclude summary judgment. Jurors are not required to accept the opinions of experts, even when those opinions are unopposed. A reasonable juror, construing the evidence in the light most favorable to the plaintiff, could choose not to believe that Frayne, Gagne, and

Forbes took these actions as part of a conscientious treatment program aimed at making the plaintiff understand he could not manipulate the system – especially because the record contains no evidence of such a program; as noted, the only treatment plan in the record is dated after this lawsuit was filed and does not suggest that sanctions such as threatening the plaintiff with placement in behavior observation status were contemplated therapies. (*See* ECF No. 84-4 at 2.) Instead, a reasonable juror could find on this record that Frayne took steps to retaliate against the plaintiff for filing a lawsuit and otherwise complaining and that Forbes walked away from his cell when he was in distress out of spite due to the plaintiff's ongoing complaints, rather than as part of a cognitive behavioral treatment strategy. Likewise, while Gagne's telling the plaintiff it was his choice to harm himself may be consistent with cognitive behavioral treatment, it may also reflect conscious disregard of a known risk – or at least a reasonable juror could so find on this record, when it is construed in the light most favorable to the plaintiff. Accordingly, the defendants' motion for summary judgment is denied as to the deliberate indifference claims against defendants Frayne, Forbes, and Gagne.

For similar reasons, the defendants are not entitled to qualified immunity. Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna,* 577 U.S \_\_\_, \_\_\_, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Although the Supreme Court's case law "'do[es] not require a case directly on point'" before a right is considered to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at \_\_\_, 136 S. Ct., at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Taylor v. Barkes*, \_\_\_ U.S. \_\_\_, \_\_\_, 135 S. Ct. 2042, 2044 (2015) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing

violates that right."). Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar v. Abbasi*, ___ U.S. ___, ___, 137 S. Ct. 1843, 1867 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Supreme Court has cautioned the lower courts many times that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, ___ U.S. ___, ___, 137 S. Ct. 548, 551 (2017) (quoting *al-Kidd*, 563 U.S. at 742). Rather, clearly established law "must be 'particularized' to the facts of the case." *Id.* at ___, 137 S. Ct. at 551 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

While the defendants contend that they acted reasonably and professionally and took no actions with intent to harm the plaintiff, this contention rests on their version of the facts. As shown, the plaintiff has introduced enough evidence from which a reasonable juror could infer that they acted in reckless disregard of a known risk of harm to the plaintiff. Even if the defendants had presented evidence that the specific actions of which the plaintiff complains were part of a conscientious, medically appropriate treatment plan – and, as noted above, they have not – there would still be a factual dispute about whether that was, in fact, true or whether they were instead acting out of spite or frustration and recklessly disregarding a known risk of serious harm to the plaintiff. And if they took the actions of which the plaintiff complains out of spite, frustration, and retaliatory intent, rather than to further a medically appropriate treatment plan, they would not be entitled to qualified immunity. Because the availability of qualified immunity depends on issues of fact that only a jury may resolve, the motion for summary judgment is denied as to qualified immunity.

IV.     Conclusion

Defendants' motion for summary judgment **[ECF No. 67]** is **GRANTED** as to the claims against Drs. Burns and Chaplin and **DENIED** in all other respects.

14

**SO ORDERED.**

Signed this 3rd day of January, 2018, at Hartford, Connecticut.

/s/
Michael P. Shea
United States District Judge